UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X
UNITED STATES OF AMERICA,

                             Plaintiff,        **MEMORANDUM & ORDER**
                                               19-CR-1 (JMA)

        -against-

FRANK PARASMO,

                             Defendant.
----------------------------------------------------------------------X

**AZRACK, United States District Judge:**

At the conclusion of a 13-day trial, a jury convicted Dr. Frank Parasmo ("Parasmo") on 32 counts of unlawfully distributing oxycodone and hydrocodone in violation of the Controlled Substances Act, 21 U.S.C. § 841(a).  Now before the Court are Parasmo's motions for a judgment of acquittal or, alternatively, for a new trial, pursuant to Federal Rules of Criminal Procedure 29 and 33, respectively.  (ECF Nos. 144, 151.)  For the following reasons, the motions are DENIED.

## I.      BACKGROUND

### A.    **The Indictment**

On January 2, 2019, Parasmo was charged with violating 21 U.S.C. § 841(a) in a 35-count Indictment.  (ECF No. 17.)  The Indictment alleged that from 2014 to 2015, Parasmo issued prescriptions to 20 of his patients for oxycodone and/or hydrocodone, both Schedule II controlled substances, in varying amounts and dosages.  (Id. ¶ 1.)  The Indictment alleged that he issued these prescriptions "without authorization," in other words, without "acting in the usual course of his professional practice . . . for a legitimate medical purpose[.]"  (Id.)

B.      **The Evidence at Trial**[1]

1.      **Standards of Medical Practice in New York**

The Government's expert medical witness, Seth Waldman, M.D. ("Dr. Waldman"), testified regarding the generally accepted standards of medical practice in New York from 2009 through 2015, specifically with respect to prescribing controlled substances such as oxycodone and hydrocodone.  (Tr.[2] 460, 462–63.)

Dr. Waldman testified that oxycodone and hydrocodone are short-acting opioid pain medications.  (Tr. 471–72.)  Both are Schedule II controlled substances.  (Tr. 463, 473–74; GX 100.)  Accordingly, they may only be prescribed by a doctor acting in the usual course of medical practice for a legitimate medical purpose.  (Tr. 463–64.)

Although both drugs may relieve chronic pain, Dr. Waldman testified that prescribing oxycodone and hydrocodone presents risks, including that the patients will experience addiction and overdose.  (Tr. 475–76.)  The risk of overdose and death increases when patients use these drugs in conjunction with illicit substances like cocaine, heroin, and amphetamines.  (Tr. 476.)  Dr. Waldman testified that these risks were commonly known among doctors in New York from 2009 to 2015.  (Tr. 477–78.)  Because of these risks, Dr. Waldman testified, it is important that doctors monitor patients prescribed oxycodone and hydrocodone by conducting toxicology screens for other substances.  (Tr. 495–96.)  Dr. Waldman explained, as an example, that drug testing is important because "if we prescribe oxycodone to someone and we find that they're taking something which is illegal, like cocaine or heroin at the same time, it becomes extremely dangerous.  Those are exactly the people who die of drug overdose[.]"  (Tr. 496.)  As a result,

---

[1]      Unless otherwise noted, the Court recounts only the evidence specific to the 32 counts on which Parasmo was convicted.

[2]      Citations to "Tr." refer to the corresponding pages of the trial transcript.  Citations to "GX" refer to the corresponding exhibits offered by the Government and admitted into evidence at trial.

under generally accepted standards of medical practice, a test that returned positive for illegal drugs would be cause for concern.  (Tr. 498–99.)

Conversely, the absence of a prescribed opioid in a drug test may indicate that the patient does not need the prescription, or that the patient is "diverting" the medication by providing it to someone else.  (Tr. 497.)  Indeed, Dr. Waldman testified that it was commonly known among New York doctors engaged in the usual course of professional practice from 2009 to 2015 that the absence of prescribed oxycodone in a drug test indicated that the patient was not using it for a legitimate medical need.  (Tr. 479.)  He explained that for these reasons, under generally accepted standards of medical practice, a doctor should not prescribe oxycodone to a patient following a drug test that is negative for oxycodone, "without a very clear explanation for how that happened." (Tr. 498.)

### 2.     Frankie Campanelli (Count 1)

The jury convicted Parasmo of unlawfully prescribing 240 30-milligram ("mg") oxycodone pills and 240 15-mg oxycodone pills to Frankie Campanelli on January 7, 2014.  (ECF No. 139 at 1.)

Campanelli, who had previously worked in Parasmo's office during an externship, was Parasmo's patient from October 2011 to approximately June 2014.  (Tr. 1605, 1611; GX 1.)  She sought treatment for lower back pain.  (Tr. 1608; GX 1.)  Despite Campanelli's complaints of pain, Parasmo did not conduct a medical examination of her or send her for an MRI, scan, or other study of her back.  (Tr. 1610–11.)  Instead, he prescribed her 30 10-mg oxycodone pills.  (Tr. 806, 1622.)  Her subsequent visits to Parasmo followed a similar pattern.  Campanelli testified that she would wait four or five hours in Parasmo's waiting room, along with "a lot of drug addicts coming to get their pills."  (Tr. 1612–13.)  These individuals had "needle marks on their arms," and she overheard them discuss "how they [were] going to sell their pills."  (Tr. 1615.)  After proceeding to the

examination room, where she would wait for another 30 minutes, Parasmo would spend approximately 15 minutes with Campanelli.  (Tr. 1612.)

Campanelli had a history of drug use that worsened while she was under Parasmo's care. Campanelli testified that, in addition to her unprescribed use of Xanax, she also "dabbl[ed]" with marijuana and cocaine.  (Tr. 1609–10.)  Over time, Campanelli became addicted to the oxycodone prescribed by Parasmo.  (Tr. 1615–16.)  Yet when she told Parasmo that she was taking her oxycodone pills like "Tic Tacs," (Tr. 1616), Parasmo failed to refer her to an addiction specialist. Instead, at her request, Parasmo repeatedly increased her opioid prescription.  (Tr. 1615–18, 1623–24, 1634–35.)  At an appointment with Parasmo on October 2, 2013, Campanelli discussed participating in a detox program to address her oxycodone addiction.  (Tr. 1634.)  At the same appointment, Parasmo issued a prescription for 240 30-mg oxycodone pills and 240 15-mg oxycodone pills.  (Tr. 1634–35.)

Soon after, Campanelli checked into a five-day detox program at Nassau University Medical Center.  (Tr. 1618–19, 1636.)  She testified that she left the program before its conclusion "to get home and get high," and immediately began using heroin intravenously.  (Tr. 1619–21.) By October 16, 2013, Campanelli had consumed all of the 480 oxycodone pills that Parasmo had prescribed just two weeks previously.  (Tr. 1635.)  She lied to Parasmo that her mother had thrown out her oxycodone while she was in the detox program, and that she was crying in pain.  (Tr. 993–94, 1635–36; GX 1.)  Although Parasmo knew that Campanelli had just exited a detox program, and that she had tested positive for methadone, he nevertheless issued a prescription for 240 15-mg oxycodone pills.  (Tr. 1635–37.)  On October 22, 2013, Parasmo prescribed Campanelli an additional 240 30-mg oxycodone pills.  (Tr. 1637.)  Dr. Waldman testified that these prescriptions—which replaced the medicine that Campanelli had gone to detox to remove—were "exactly counter to what they were intending to do with the detox," and risked Campanelli's health.

4

(Tr. 827–30.)  Dr. Waldman further testified that Parasmo's prescriptions "just maintain[ed] her in this state of being addicted to oxycodone and Xanax."  (Tr. 831.)

In November 2013, Parasmo referred Campanelli to a pain management specialist, but he did not follow up regarding the referral.  (Tr. 810, 1638–40; GX 1.)  In December 2013, Parasmo noted that he planned to reduce Campanelli's prescription.  (Tr. 810; GX 1.)  On January 7, 2014, however, instead of weaning Campanelli off oxycodone, Parasmo wrote the prescriptions underlying Count 1, for 240 30-mg oxycodone pills and 240 15-mg oxycodone pills.  (Tr. 810–11; GX 21–22.)  Dr. Waldman testified that these prescriptions were not issued in the normal course of professional practice and were not for a legitimate medical purpose.  (Tr. 805–06, 832.)

### 3.    William Lott (Counts 2 Through 5)

The jury convicted Parasmo of unlawfully prescribing 150 30-mg oxycodone pills to William Lott on May 8, 2014 (Count 2); July 10, 2014 (Count 3); February 2, 2015 (Count 4); and December 1, 2014 (Count 5).  (ECF No. 139 at 1–2.)

Lott, a 59-year-old retiree, first sought treatment from Parasmo in 2009.  (Tr. 576; GX 2.) At the start of his treatment, Lott suffered from lumbar stenosis, scoliosis, and chronic lower back pain.  (Tr. 1358–59.)  Lott had a history of alcoholism and multiple drug overdoses, and he had participated in a detox program.  (Tr. 578–79; GX 2.)  He was simultaneously being treated for bipolar disorder and schizophrenia, and he was taking three 20-mg doses of methadone daily.  (Tr. 578; GX 2.)

In January 2012, Lott was hospitalized for approximately two months following a drug overdose at home.  (Tr. 578–79, 583; GX 2.)  During this time, he developed anterior compartment syndrome, which required surgery to save his leg.  (Tr. 579; GX 2.)  When Lott was released from the hospital, Parasmo, despite knowing of Lott's overdose, prescribed him hydromorphone and oxycodone.  (Tr. 582–84; GX 2.)  Later that year, Lott was hospitalized again for 16 days following

another overdose.  (Tr. 582; GX 2.)  Drug tests from 2014 showed marijuana, but no oxycodone, in Lott's system.  (Tr. 1374–75; GX 2.)

Parasmo nevertheless continued to issue prescriptions to Lott through 2014 and 2015.  Dr. Waldman testified that these prescriptions were not issued for a legitimate medical purpose and were not in the normal course of professional practice.  (Tr. 577.)  Dr. Waldman further testified that Lott's survival was "fortunate and remarkable," and that Parasmo's prescriptions "contributed to the overdose."  (Tr. 584–85.)

### 4.    Summer Ferro (Count 7)

The jury convicted Parasmo of unlawfully prescribing 120 5-mg oxycodone pills to Summer Ferro on July 7, 2015.  (ECF No. 139 at 2.)

Ferro, a 30-year-old woman, became Parasmo's patient in 2011.  (Tr. 523; GX 3.)  Her chief complaints at that time were panic/anxiety attacks, asthma, and stomach problems.  (Tr. 523; GX 3.)  Ferro's records reflect a history of positive drug tests for cocaine and marijuana, as well as signs of psychiatric disorder.  (Tr. 526–29; GX 3.)  In December 2012, Parasmo sought to discharge Ferro from his care for noncompliance and to refer her to a pain management specialist.  (Tr. 527, 1048–50; GX 3.)  Ultimately, however, he kept her as a patient and continued to prescribe opioids to her.  (Tr. 530.)  Ferro again tested positive for cocaine and marijuana, in addition to oxycodone, in June 2014 and May 2015.  (Tr. 531–34; GX 3.)  Parasmo apparently recognized Ferro's substance abuse issues, and at an appointment on May 22, 2015, he noted "cannot give controlled substances."  (Tr. 533; GX 3.)  Yet at the very same appointment, he issued a prescription for 60 5-mg oxycodone pills.  (Tr. 533; GX 3.)  And on July 7, 2015, Parasmo prescribed 120 5-mg oxycodone pills.  (Tr. 523; GX 28.)

Dr. Waldman testified that the July 7, 2015 prescription was not issued in the normal course of professional practice and was not for a legitimate medical purpose.  (Tr. 523–24.)  Ferro's

medical records were replete with information "that points to behavioral problems and points to substance abuse problems, but not which point to any need to be using an opioid pain medication." (Tr. 524–25.)   Indeed, Dr. Waldman testified that, given Ferro's repeated complaints of constipation, prescribing more oxycodone—itself a "well-known" cause of constipation—was "just making the situation much worse for her."  (Tr. 531–32.)  In light of her well-documented substance abuse issues, Parasmo's opioid prescriptions increased her risk of fatal overdose "dramatically."  (Tr. 532.)

### 5.  Brian Horace (Counts 8 Through 10)

The jury convicted Parasmo of unlawfully prescribing 500 30-mg oxycodone pills and 80 15-mg oxycodone pills to Brian Horace on November 14, 2014 (Count 8); December 12, 2014 (Count 9); and April 21, 2015 (Count 10).  (ECF No. 139 at 2–3.)

Horace became Parasmo's patient in 2006.  Horace was 44 years old at the time and complained of back and neck pain.  (Tr. 771; GX 4.)  Parasmo prescribed him oxycodone for his pain.  (Tr. 777; GX 4.)  However, warning signs soon emerged.  In May 2008, Horace's pain management specialist, Dr. Paticoff, recommended that Horace reduce his then-current doses of methadone and Soma, a muscle relaxant, because Horace "was on too much medication."  (Tr. 776–77.) Beginning in 2011, Parasmo received multiple toxicology screens indicating that Horace was suffering from substance abuse disorder.  For example, in July 2011, Parasmo received an abnormal toxicology report reflecting buprenorphine, a drug used to treat substance abuse disorder, and cocaine, but not the oxycodone that Parasmo had prescribed to him.  (Tr. 779–80; GX 4.) Parasmo noted, "no meds with potential of abuse under any circumstances."  (Tr. 779; GX 4.) Again, however, he continued to prescribe oxycodone to Horace.  (Tr. 778.)  In April 2012, a new toxicology report showed the presence of cocaine.  (Tr. 781.)   Tellingly, this report was adulterated—Horace's urine had been diluted with water—presumably by Horace himself in an

7

attempt to avoid detection of a substance that may have been in his urine when the sample was taken. (Tr. 781–82.) Despite these red flags, Parasmo prescribed to Horace 100 30-mg oxycodone pills, and he continued to increase Horace's prescription dosage over the summer of 2012. (Tr. 782–85.)

Dr. Waldman testified that after March 2012, Parasmo had crossed a red line by continuing to issue prescriptions to Horace. Dr. Waldman explained that "with the multiple abnormal toxicology screens by that point, there was adequate reason to be suspicious of a substance abuse disorder and it would be inappropriate, except in very limited circumstances and very limited amounts, to give the patient any opioid prescriptions." (Tr. 774.) Despite ample signs of substance abuse, Parasmo continued prescribing oxycodone to Horace—and even increased his prescription over time. (Tr. 779–89.)

Craig Shalmi, M.D. ("Dr. Shalmi"), a pain management specialist, testified that when he saw Horace for appointments in January and February 2015, on referral from Parasmo, he told Horace that he would not continue to prescribe oxycodone and would seek to wean Horace off oxycodone entirely. (Tr. 266–67, 271–72.) Based on his review of Horace's medical records, Dr. Shalmi testified that he believed Horace "had more of a dependency issue, a medication dependency issue than a pain issue." (Tr. 273.) However, Horace was not willing to be weaned off oxycodone, (Tr. 271), and so he returned to Parasmo for additional oxycodone prescriptions. (Tr. 788–89.) Notwithstanding Dr. Shalmi's assessment that Horace should be weaned off oxycodone, on April 21, 2015, Parasmo prescribed Horace 500 30-mg oxycodone pills and 80 15-mg oxycodone pills. (GX 33–34.)

Based on the evidence in the record, Dr. Waldman testified that the prescriptions issued on November 14, 2014, December 12, 2014, and April 12, 2015, were not issued in the normal course of professional practice and for a legitimate medical purpose. (Tr. 771–72, 788–89.)

### 6.      Leslie Finnegan-Andrews (Counts 11 and 12)

The jury convicted Parasmo of unlawfully prescribing 105 30-mg oxycodone pills to Leslie Finnegan-Andrews on June 25, 2015 (Count 11), as well as 63 20-mg oxycodone pills and 60 40-mg oxycodone pills on December 17, 2015 (Count 12).  (ECF No. 139 at 3.)

Finnegan-Andrews first sought treatment from Parasmo in July 2013, complaining of severe migraines and hip pain.  (Tr. 535–36; GX 5.)  Parasmo initially prescribed 15-mg oxycodone pills.  (Tr. 537; GX 5.)  Over subsequent appointments, however, Parasmo prescribed increasingly higher amounts of oxycodone, to 20-mg and then 30-mg pills.  (Tr. 537; GX 5.)  Dr. Waldman testified that Parasmo did so "without any specific escalation."  (Tr. 537, 539–40.)  In June 2014, Parasmo referred Finnegan-Andrews to pain management specialists, took her off codeine, and noted that she should be weaned off oxycodone.  (Tr. 540–41; GX 5.)

Finnegan-Andrews' records also reflect a history of abnormal toxicology test results.  For example, a urine toxicology screen on September 4, 2015 was positive for unprescribed drugs, including codeine, morphine, and hydromorphone.  (Tr. 537–38; GX 5.)  At a subsequent appointment in October 2015, Finnegan-Andrews continued to report chronic headaches and lower back pain.  (Tr. 1490–91; GX 5.)  Parasmo noted that she was "continually asking for more pain meds," and "her brother who needs pain meds lives with her."  (Tr. 545–46; GX 5.)  He even speculated, "[m]aybe that is why she keeps asking me for more pain meds." (GX 5.)  Dr. Waldman characterized this exchange, and Parasmo's note, as "suspicious for diversion, that there is someone in the household who might be using her medications."  (Tr. 546.)  Notably, later test results from November 13, 2015 showed that Finnegan-Andrews had no opioids in her system, despite the fact that Parasmo had continued to prescribe oxycodone.  (Tr. 547–48; GX 5.)  Dr. Waldman testified that the absence of oxycodone in her test results indicates that Finnegan-Andrews "doesn't have pain or the same amount of pain as you thought[,] or she's using them out

early and therefore has none[,] or is being taken by somebody else for whatever reason and therefore, she's not consuming it."  (Tr. 548.)  Under any of these scenarios, according to Dr. Waldman, the results demonstrate that Finnegan-Andrews "doesn't need [oxycodone] to treat her pain because she's able to exist without it."  (Tr. 548.)

At a subsequent appointment on December 17, 2015, Parasmo informed Finnegan-Andrews that he was "no longer treating chronic pain."  (GX 5.)  Although she reported that she "ran out of meds less than 2 weeks after [Parasmo] gave her [a] refill," (Tr. 1493; GX 5), Parasmo nonetheless issued prescriptions for 63 20-mg oxycodone pills, (GX 28), and 60 40-mg oxycodone pills (GX 37).  Dr. Waldman testified that these prescriptions, as well as the prescription issued on June 15, 2015, (GX 35), were not issued in the normal course of professional practice and for a legitimate medical purpose.  (Tr. 536–38.)

### 7.    John Lettenberger (Counts 13 and 14)

The jury convicted Parasmo of unlawfully prescribing 240 30-mg oxycodone pills to John Lettenberger on June 26, 2014 (Count 13) and January 15, 2015 (Count 14).  (ECF No. 139 at 3–4.)

Lettenberger began seeing Parasmo in 2009 following a car accident in which he had been seriously injured.  (Tr. 611–12; GX 6.)  At that time, Lettenberger was already on a "high dose" of fentanyl—100 micrograms—and 7.5 mg of oxycodone.  (Tr. 616; GX 6.)  Toxicology reports from that time also indicated that Lettenberger had an active substance abuse disorder.  For example, a report from October 2, 2009 detected cocaine.  (Tr. 618; GX 6.)  Later, in 2011, Parasmo's records reflect that Lettenberger was attending Narcotics Anonymous ("NA") meetings.  (Tr. 618–19; GX 6.)  Even while Lettenberger was attending NA meetings to treat his substance abuse disorder, however, Parasmo continued to prescribe him opioids.  (Tr. 619.)

By the spring of 2014, Lettenberger was prescribed 240 30-mg oxycodone pills per month. (Tr. 620.)  Parasmo's notes from this time reflect that Lettenberger told Parasmo that he "owes fifty oxys" to someone, and therefore needed increase his prescription from 240 pills.  (Tr. 613, 620–21; GX 6.)  Although Parasmo's notes suggest that he refused to provide the additional pills, (Tr. 1337), Dr. Waldman testified that Lettenberger's statement shows that Lettenberger "is already and has been in the process of diverting at least some of his medications."  (Tr. 621.)  Indeed, contemporaneous toxicology reports confirmed that Lettenberger was not taking his oxycodone as prescribed.  On June 2, 2014, Lettenberger tested positive for cocaine but negative for oxycodone, his prescribed medication.  (Tr. 621; GX 6.)  At an appointment the following day, Parasmo noted that Lettenberger told him he "had some coke at a party," and that after running out of oxycodone pills, he bought Vicodin "on the street."  (Tr. 622–23; GX 6.)  Parasmo also noted that Lettenberger was moving well and was animated, which was inconsistent with previous reports of severe back pain.  (Tr. 622; GX 6.)  Dr. Waldman testified that, taken together, these records indicate "a severe substance abuse disorder."  (Tr. 623.)  Nevertheless, on June 26, 2014, Parasmo issued a prescription for 240 30-mg oxycodone pills.  (Tr. 622; GX 6, 38.)

In August 2014, Lettenberger attempted suicide.  (Tr. 614, 1338; GX 6.)  When Parasmo subsequently issued a new oxycodone prescription, the pharmacist contacted Parasmo's office to notify him that they were uncomfortable filling Lettenberger's because they were concerned about the number of pills being prescribed.  (Tr. 614, 623.)  Dr. Waldman testified that this "would at least warrant a discussion with the pharmacist or a reconsideration of what [Parasmo was] doing."  (Tr. 624.)  Still, Parasmo prescribed 240 30-mg oxycodone pills to Lettenberger on January 15, 2015.  (Tr. 614; GX 39.)  Dr. Waldman testified that this prescription, as well as the prescription issued on June 24, 2014, was not issued in the normal course of professional practice for a legitimate medical purpose.  (Tr. 612–14.)

11

### 8.    Maurice Milano (Count 15)

The jury convicted Parasmo of unlawfully prescribing 180 30-mg oxycodone pills and 60 15-mg oxycodone pills to Maurice Milano on May 6, 2015.  (ECF No. 139 at 4.)

Milano began seeing Parasmo in 2008, reporting lower back pain stemming from a motorcycle accident and prior gunshot wound.  (Tr. 586–87; GX 7.)  Parasmo prescribed him Vicodin.  (GX 7.)  Soon after, Milano told Parasmo that he was buying drugs on the street, as well as using his mother's Vicodin and his aunt's hydromorphone.  (Tr. 587, 1387; GX 7.)  Milano also had multiple abnormal toxicology screens from 2010 to 2011.  These reports repeatedly showed, among other substances, cocaine, methadone, morphine, and codeine; they did not detect the oxycodone that Parasmo had prescribed.  (Tr. 587–90; GX 7.)  Dr. Waldman testified that these reports represent "a marker of a serious substance abuse disorder and it's important not to contribute to that by adding additional controlled substances including opiates."  (Tr. 590.)  Yet Parasmo continued to prescribe Milano oxycodone.  (Tr. 590–91.)

Meeru Sathi-Welsch, M.D. ("Dr. Sathi-Welsch"), a pain management specialist, testified that Milano should not have been prescribed opioids at this time.  Dr. Sathi-Welsch examined Milano in February 2010.  (Tr. 368, 382.)  Dr. Sathi-Welsch testified that Milano's toxicology reports returned positive for cocaine and marijuana.  (Tr. 382–83.)  In fact, Milano even told her that he had recently used cocaine and was "buying drugs off the street."  (Tr. 383.)  As a result, Dr. Sathi-Welsch refused to prescribe opioids to Milano; instead, she offered non-opioid treatments, such as injections and acupuncture.  (Tr. 383.)  Dr. Sathi-Welsch testified that she provided a summary of Milano's appointment to Parasmo, including a description of her decision to not prescribe opioids to him.  (Tr. 384–87.)  Parasmo continued to prescribe opioids.  (GX 7.)

Further warning signs of Milano's substance abuse issues went unheeded by Parasmo in 2014 and 2015.  In June 2014, a toxicology screening again reflected a positive result for cocaine

and a possible, but unconfirmed, result for a heroin metabolite. (Tr. 592–93; GX 7.) Moreover, in October 2014 and March 2015, Suffolk County Probation Officers informed Parasmo that Milano had failed drug tests. Specifically, Probation Officer Martha Argyros ("Officer Argyros") testified that she told Parasmo that Milano was on probation and had six positive test results for cocaine, one for morphine, and one for heroin. (Tr. 95.) Parasmo acknowledged to Officer Argyros that Milano "could be selling" his prescribed oxycodone, and he told her that he would attempt to wean Milano off oxycodone.[3] (Tr. 55–56.) Probation Officer Valeri Verdi, now retired, testified that on March 13, 2015, she told Parasmo of her concern that Milano was continuing to take oxycodone and Xanax given his history of substance abuse. (Tr. 240–41.)

Despite the above information, on May 6, 2015, Parasmo prescribed to Milano 180 30-mg oxycodone pills and 60 15-mg oxycodone pills. (GX 40–41.) Dr. Waldman testified that these prescriptions were not issued in the normal course of professional practice and treatment and for legitimate medical purpose. (Tr. 585–86, 594–96.)

### 9.   Leonard Marino (Counts 16 and 17)

Parasmo was convicted of unlawfully prescribing 120 30-mg oxycodone pills to Leonard Marino on June 18, 2015 (Count 16), and December 28, 2015 (Count 17). (ECF No. 139 at 4.)

Marino first sought treatment from Parasmo in 2008; he was 20 years old at the time. (Tr. 624; GX 8.) Warning signs of substance abuse appeared early. Marino was receiving opioid prescriptions from multiple doctors simultaneously in 2010, which Dr. Waldman referred to as "doctor shopping." (Tr. 627–28.) Notably, Marino also repeatedly reported losing his medications or running out of them early. (Tr. 628–34.) Several of these episodes involved Marino's mother.

---

[3]     Following her October 17, 2014 conversation with Parasmo, Officer Argyros contacted investigators at the United States Drug Enforcement Administration ("DEA") to "further investigate what is going on with the prescription medication that's being prescribed to [Milano]." (Tr. 59–60.) In a subsequent interview with DEA investigators, Parasmo denied that Officer Argyros had told him that Milano had tested positive for illicit substances. (Tr. 119.)

For example, in July 2012, Marino told Parasmo that his mother was "getting scripts in his name because she has no insurance." (Tr. 633; GX 8.) Dr. Waldman testified that this "repeated pattern of being out early and of losing your medications by whatever mechanism is a sign that the patient is overusing or selling the medication." (Tr. 632–33.) Parasmo declined to prescribe oxycodone at that time, but later that same month, he issued another oxycodone prescription to Marino. (Tr. 634–35; GX 8.) Despite Marino's continued reports of lost or stolen medications, (Tr. 637–38, 640), Parasmo continued to prescribe him oxycodone, after briefly exploring surgery as an alternative form of pain management. (Tr. 638–42, 1201; GX 8.) In 2014 and 2015, Parasmo received multiple abnormal toxicology reports for Marino; these included reports that reflected positive tests for MDMA, cocaine, morphine, and marijuana, as well as at least one report in 2015 that was negative for Marino's prescribed medications. (Tr. 638–43.)

Nevertheless, Parasmo issued to Marino his standard oxycodone prescription on June 18, 2015. (GX 8, 43.) On July 14, 2015, Parasmo noted that he planned to wean Marino off oxycodone by reducing his prescription. (Tr. 640; GX 8.) Instead, he increased Marino's prescription throughout the fall of 2015, until Marino's final prescription for oxycodone on December 28, 2015. (Tr. 640–42; GX 8, 42.) Dr. Waldman testified that, based on these facts, the prescriptions underlying Counts 16 and 17 were not issued in the normal course of professional practice and for a legitimate medical purpose. (Tr. 625–26.)

### 10.    Christina Pepe (Count 18)

Parasmo was convicted of unlawfully prescribing 240 15-mg oxycodone pills to Christina Pepe on December 4, 2014. (ECF No. 139 at 4.)

Pepe first saw Parasmo in 2012, complaining of broken ribs and herniated discs in her back. (Tr. 796; GX 9.) There were soon clear signs of substance abuse. At her next visit in April 2013, Pepe appeared to have multiple track marks from intravenous drug abuse. (Tr. 800; GX 9.) At a

14

September 5, 2013 appointment, a test detected cocaine in her urine; she also stated that she had taken "Molly," or MDMA.  Pepe also reported that she "does not know what she takes."  (Tr. 800; GX 9.)  At her next appointment, Parasmo prescribed Pepe 180 15-mg oxycodone pills.  (Tr. 800–01; GX 9.)  Dr. Waldman testified that in light of her drug use, this prescription was "dangerous" and "put[] her at substantial risk for overdose."  (Tr. 800–01.)

In November 2013, after Pepe had recently tested positive for unprescribed morphine, cocaine, and marijuana, Parasmo informed her by letter that he would no longer prescribe her controlled substances.  (Tr. 801–03; GX 9.)  By the spring of 2014, however, Parasmo had relented. In fact, he continued to prescribe oxycodone to Pepe even after a June 2014 toxicology screen returned positive for heroin metabolite, as well as unprescribed codeine and hydromorphone.  (Tr. 802–03; GX 9.)  Dr. Waldman testified that this report indicated that Pepe was "an extreme risk for overdose."  (Tr. 803.)  Pepe reported extreme pain in July 2014.  (GX 8.)  Parasmo issued his final oxycodone prescription to Pepe on December 4, 2014, for 240 15-mg pills.  (GX 44.)  In light of Pepe's well-documented substance abuse issues, Dr. Waldman concluded that the December 4, 2014 prescription was not issued in the normal course of professional practice and was not for a legitimate medical purpose.  (Tr. 796–99, 803–04.)

### 11.   Rocco Oliveri (Counts 19 and 20)

Parasmo was convicted of unlawfully prescribing 150 30-mg oxycodone pills to Rocco Oliveri on February 6, 2015 (Count 19), and 120 30-mg oxycodone pills on June 26, 2015 (Count 20).  (ECF No. 139 at 5.)

Oliveri was 49 years old when he first sought treatment from Parasmo in 2009.  (Tr. 684; GX 10.)  His records reflect a history of substance abuse, which Dr. Waldman testified was "active" at the same time he was receiving opioid prescriptions from Parasmo.  (Tr. 685.)  Oliveri repeatedly tested positive for buprenorphine and was prescribed Suboxone, both of which are

15

drugs administered to treat substance abuse.  (Tr. 687, 699; GX 10.)  Yet even when an addiction specialist specifically requested that Parasmo no longer prescribe oxycodone to Oliveri, Parasmo continued prescribing oxycodone to him anyway.  (Tr. 702.)

Oliveri had many abnormal toxicology reports.  Some reports, such as those from April, June, and July 2009, returned negative for drugs that he had been prescribed, including oxycodone and Percocet.  (Tr. 685; GX 10.)  Another returned positive for cocaine, although Oliveri claimed this was a "mistake."  (Tr. 691; GX 10.)  Dr. Waldman testified that Oliveri's abnormal toxicology results were significant because "[i]f a patient's in pain and requires the medication on a continuous basis, then he should have the medication in his system all the time and not the presence of other medications."  (Tr. 690.)

There was also substantial evidence that Parasmo was aware that the medication he prescribed to Oliveri was being diverted elsewhere.  In February 2012, for example, Oliveri reported that he had been attacked at home, and that someone "[s]tole all his meds."  (Tr. 693; GX 10.)  Notes from Oliveri's medical file, dated August 17, 2012, suggest that there was drug dealing activity at his home, as Oliveri's neighbors had complained of "much car traffic at his house," where individuals were "handed a bag by his son and they drive off."  (Tr. 694; GX 10.) Dr. Waldman testified that this note "suggests that the doctor's aware that there's a high risk that these medicines are not being taken by the patient, but instead are being sold," which "creates a risk for all the people who are potentially taking that medication."  (Tr. 694.)  Just over a month later, Oliveri again reported that his medication had been stolen from his home.  (Tr. 695.)  Dr. Waldman testified that this could be "aberrant behavior, meaning that the patient, it might be fabricated because the patient wants an additional prescription."  (Tr. 695.)  Dr. Waldman further explained that if, however, Oliveri's pills were in fact stolen from his home, that "means you're putting controlled substances into a very unsecured environment and they're likely to be taken by other

16

people and used by others, which could cause overdose and harm to them." (Tr. 695.)

This pattern continued in October 2013, when Oliveri informed Parasmo that his son's friends had stolen his oxycodone and "beat him up." (Tr. 702; GX 10.) Contemporaneous toxicology reports confirmed that Oliveri—who was being treated for substance abuse at the time—was not taking the oxycodone Parasmo prescribed. (Tr. 702–03.) In fact, Oliveri's addiction psychiatrist specifically requested that Parasmo cease writing oxycodone prescriptions for him. (Tr. 702; GX 10.) Dr. Waldman testified that Parasmo's decision to continue prescribing oxycodone to Oliveri was "a terrible mistake." (Tr. 703.) He further explained that

> There's very good documentation in the chart that this patient doesn't take oxycodone and there's good documentation in the chart that this patient says that his oxycodone is being stolen and sold by his son, and to continue to give the patient prescriptions for oxycodone to allow that to go on is just perpetuating the diver[t]ing of the medication and has nothing to do with the patient's pain condition or with his health.

(Tr. 705.)

However, Parasmo did not stop prescribing oxycodone to Oliveri. Although Parasmo occasionally noted plans to wean oxycodone, he instead increased Oliveri's prescription over time—despite previously receiving letters from United Healthcare in 2012 and 2014 warning that he was prescribing to Oliveri a high daily dose of oxycodone. (Tr. 687, 690, 703, 706–10; GX 10.)

Based on this evidence, Dr. Waldman testified that the prescription for 150 30-mg oxycodone pills filled on February 6, 2015, (GX 45), and the prescription for 120 30-mg oxycodone pills issued on June 26, 2015, (GX 46), were not issued for a legitimate medical purpose and were not in the normal course of professional practice. (Tr. 684.)

### 12. Paul Peskett (Count 21)

Parasmo was convicted of unlawfully prescribing 120 10-mg hydrocodone pills to Paul Peskett on April 2, 2015. (ECF No. 139 at 5.)

Peskett, then 29 years old, first sought treatment from Parasmo in 2002 for asthma,

osteoarthritis, and panic attacks.  (Tr. 710–11, 714–15; GX 11.)  Soon after, he was prescribed "a very high dose" of methadone, and later, Suboxone.  Dr. Waldman testified that both prescriptions suggested that Peskett was undergoing substance abuse treatment for opioid addiction.  (Tr. 711–12, 715–16; GX 11.)  In 2004, Parasmo received a letter from Caremark Pharmacy expressing concern that Peskett's prescriptions—for hydrocodone, Ambien, and Xanax—put him at increased risk for overdose.  (Tr. 716–17; GX 11.)

Parasmo also received other warning signs regarding Peskett's overdose risk.  In April 2009, for example, Parasmo noted that in connection with a urine toxicology screen, Peskett gave him a "cup of water for urine, very cold."  (Tr. 719; GX 11.)  Dr. Waldman testified that Parasmo "was aware that the patient was trying to evade the urine toxicology screening."  (Tr. 719.)  Multiple toxicology screens reflected non-prescribed narcotics, including morphine and cocaine, which put Peskett at risk when taken with his prescribed opioids.  (Tr. 719, 721, 724; GX 11.)  Notably, in December 2009, Parasmo prescribed Vicodin to Peskett, and, in an apparent reference to Peskett's wife, "Percocet for her."  (Tr. 721; GX 11.)  Dr. Waldman testified that it would be "very dangerous, obviously" for Parasmo to prescribe an opioid for an individual who was not his patient.  Dr. Waldman testified further that he "never heard of a situation where somebody would write a prescription to somebody else unless they're intending for it to be diverted."  (Tr. 722.)  In fact, Parasmo's records from January 2012 and June 2012 show that he knew that Peskett was sharing his prescriptions with his wife.  (Tr. 723–24; GX 11.)  Parasmo nevertheless continued to prescribe opioids to Peskett, including 120 10-mg hydrocodone pills April 2, 2015.  (GX 57.)  Dr. Waldman testified that, given Peskett's substance abuse issues and the evident signs of diversion, this prescription was not issued in the normal course of professional practice and was not for a legitimate medical purpose.  (Tr. 711–14.)

18

### 13.    Maria Scalcione (Counts 22 and 23)

Parasmo was convicted of unlawfully prescribing 150 30-mg oxycodone pills to Maria Scalcione on January 13, 2015 (Count 22), and 90 30-mg oxycodone pills on December 29, 2015 (Count 23).  (ECF No. 139 at 5.)

Scalcione began seeing Parasmo in 2011.  Her records reflect that she had been in a car accident in 2008; she sought treatment for severe pain in her neck and tingling in her arm and hand.  (Tr. 726, 733–34; GX 12.)  There was also substantial evidence that Scalcione was struggling with substance abuse, and that she was diverting the medication prescribed to her by Parasmo.  Scalcione's medical records also showed that in 2012, she was "doctor shopping" by seeing multiple doctors and receiving multiple, overlapping prescriptions at the same time.  (Tr. 741–42; GX 12.)  Scalcione had many abnormal toxicology reports that were positive for illicit substances like cocaine, and negative for the opioids prescribed by Parasmo.  (Tr. 736–41; GX 12.)  Dr. Waldman testified that her repeated abnormal toxicology results were significant because

> If a patient comes to your office complaining of pain, and they have toxicology screens which document that you've been giving them opioids and they have not been taking them, it indicates that the patient is not actually having enough pain to take the opioids and you should not continue to give them opioids because those medicines are going somewhere else.

(Tr. 742.)

In 2013 and 2014, Scalcione reported extreme back pain, but a surgeon advised that she wait for corrective surgery.  (Tr. 1106–09; GX 12.)  Parasmo continued prescribing opioids to Scalcione, even after he received letters from insurance companies alerting him to her chronic opioid use, substance abuse, and prior doctor shopping.  (Tr. 745–46, 748–49; GX 12.)

By the summer of 2015, following continued abnormal toxicology results, Parasmo noted that he would not prescribe Scalcione pain medication and would instead refer her to a pain management specialist.  (Tr. 732; GX 12.)  In October 2015, Scalcione was "begging" Parasmo to

give her pain medication.  Around the same time, her sister contacted Parasmo and said that she would "report" him if he continued to prescribe opioids to Scalcione because "she's not taking them, she's selling them."  (Tr. 753–54; GX 12.)  Throughout the fall of 2015, Scalcione had repeated abnormal toxicology screens that were negative for opioids.  (Tr. 754–55; GX 12.)

Parasmo's notes from December 29, 2015, reflect that Scalcione's pain management specialist had "left town," that she had "one pill left," and "coke in her urine 2x." (Tr. 1118; GX 12.)  He noted that she "went into withdrawal last time I cut her off."  (GX 12.)  He then issued the prescription underlying Count 23, for 90 30-mg oxycodone pills.  (GX 49.)  Dr. Waldman testified that he was "concerned" by this prescription "because there are multiple documents that show the patient has a substance abuse issue.  There's are multiple points where it's clear that the patient is not always using her Oxycodone and mostly not using it.  And there are points in the chart where the doctor was notified by the patient's family that she's in fact selling her medication."  (Tr. 756.)

Dr. Waldman testified that, based on the facts outlined above, the prescriptions underlying Counts 22 and 23 were not issued in the normal course of professional medical practice and were not for a legitimate medical purpose.  (Tr. 727.)

### 14. Michael Morrow (Counts 24 and 25)

Parasmo was convicted of unlawfully prescribing 150 30-mg oxycodone pills to Michael Morrow ("Michael") on January 14, 2015 (Count 24), and 90 20-mg oxycodone pills on August 20, 2015 (Count 25).  (ECF No. 139 at 6.)

Michael became Parasmo's patient in August 2011.  (Tr. 653; GX 13.)  He complained of back pain, and later, muscular pain; he also had suffered a spinal injury as a child that had, for a time, left him paralyzed.  (Tr. 653–54; GX 13.)  Michael had repeated abnormal toxicology results. Many of these results showed the presence of drugs Parasmo had not prescribed to him, such as

morphine, benzodiazepines, and Suboxone, the drug used to treat opioid addiction.  (Tr. 655–60, 662–63; GX 13.)  In fact, a pharmacist informed Parasmo's office in August or September 2013 that Michael had been prescribed Suboxone by another doctor.  (Tr. 657–58; GX 13.)  Even though Michael was evidently under treatment for opioid addiction, at a subsequent appointment in September 2013, Parasmo issued a prescription for oxycodone.  (Tr. 658–59; GX 13.)  Parasmo's notes from November 2013 reflect that Michael reported chronic back pain, but also that Parasmo was aware that Michael had a substance abuse problem and was "doctor shopping" for opioids.  (Tr. 664–65; GX 13.)  Later records from October and December 2014 contain abnormal toxicology showing continued use of medications not prescribed by Parasmo, including morphine and Suboxone, as well as alcohol use.  (Tr. 652, 662–63; GX 13.)

Michael had abnormal toxicology results throughout the summer of 2015.  Tests in June and July 2015 reflected alcohol use, Klonopin, Suboxone, and naloxone, a drug used to treat opioid overdose.  (Tr. 652; GX 13.)  Neither test showed the oxycodone that Parasmo had prescribed to Michael.  (Tr. 652; GX 13.)  Nevertheless, Parasmo continued to prescribe oxycodone.  (GX 13.)

On August 20, 2015, toxicology results showed Suboxone, but no oxycodone, in Michael's urine.  (Tr. 665–66; GX 13.)  Michael reported to Parasmo that he was taking his son's Suboxone, and that his son was a recovering heroin addict.  (GX 13.)  Parasmo noted that he would wean Michael off oxycodone and refer him to pain management.  He also issued a reduced prescription for oxycodone, as well as 60 30-mg pills of time-released morphine.  (Tr. 668; GX 13, 51.)  Dr. Waldman testified that given Michael's history of substance abuse and abnormal toxicology results, "was not in his best interest because it risks overdose."  (Tr. 668–69.)

Dr. Waldman testified that, based on these facts, the prescriptions underlying Counts 24 and 25 were issued outside the usual course of professional medical practice and without a legitimate medical purpose.  (Tr. 650–51.)

15.     **Steven Morrow (Counts 26 and 27)**

Parasmo was convicted of unlawfully prescribing 240 30-mg oxycodone pills to Steven Morrow ("Steven") on January 14, 2015 (Count 26), and 150 30-mg oxycodone pills on August 20, 2015 (Count 27).  (ECF No. 139 at 6.)

Steven first sought treatment from Parasmo in 2011 after he severely injured his ankle; he was 51 years old at the time.  (Tr. 669; GX 14.)  Steven's records reflect serious substance abuse issues that were ongoing while he was under Parasmo's care.  Indeed, Dr. Waldman testified that Parasmo appeared to recognize this issue, following multiple abnormal toxicology reports and a diagnosis of hypogonadism, a condition often associated with chronic opioid use in men.  (Tr. 671–72; GX 14.)  On November 25, 2013, Parasmo noted that he would no longer prescribe oxycodone to Steven.  (Tr. 672; GX 14.)  By January 2014, however, following Steven's repeated complaints of pain, Parasmo relented.   Instead of tapering Steven's oxycodone prescription, Parasmo increased it from 180 30-mg pills to 240 30-mg pills.  (Tr. 676–77; GX 14.)

Third parties also repeatedly alerted Parasmo to Steven's ongoing substance abuse issues. For example, a letter from Optum Prescription Solutions notified Parasmo that between September and November 2012, Steven had filled controlled substance prescriptions at four different pharmacies.  (Tr. 671; GX 14.)  A later letter from Optum warned Parasmo that Steven had been prescribed high amounts of opioids.  (Tr. 672; GX 14.)  Most notably, in February 2015 the Town of Babylon Department of Human Services, Division of Drug and Alcohol Services warned Parasmo that an addiction treatment facility had Steven diagnosed with "severe" opioid use disorder.  (Tr. 673, 681; GX 14.)  Dr. Waldman testified that Steven should have been "treated for substance abuse disorder" at this time, and that Parasmo's decision to continue prescribing opioids to him was "very dangerous."  (Tr. 681.)

Notes from an appointment on August 20, 2015, show yet another abnormal toxicology

report, with Steven testing positive for codeine, morphine, and hydromorphone, but negative for the oxycodone that Parasmo had prescribed to him.  (Tr. 682–83; GX 14.)  Parasmo reduced, but did not eliminate, Steven's oxycodone prescription.  (GX 14.)  Dr. Waldman testified that this prescription, (GX 53), in addition to the January 14, 2015 prescription, (GX 52), was not issued within the usual course of professional medical practice and was not for a legitimate medical purpose.  (Tr. 683.)  He explained that, "[b]y this point in the patient's care, there are many, many episodes in which the patient demonstrated that he has a severe substance use disorder, [which] was documented by other professionals who also thought he had a severe substance use disorder." (Tr. 683.)  Dr. Waldman also testified that Steven's continued use of multiple, unprescribed drugs "means it's very dangerous for him to take additional medication on top of that because the likelihood is that this process will continue and, in fact, will probably get worse, leading to an overdose."  (Tr. 683–84.)

### 16.    Mary Fusco Roland (Counts 28 Through 30)

Parasmo was convicted of unlawfully prescribing 180 30-mg oxycodone pills to Mary Fusco Roland ("Mary") on January 16, 2015 (Count 28), 120 30-mg oxycodone pills on March 30, 2015 (Count 29), and 90 30-mg oxycodone pills on April 23, 2015 (Count 30).  (ECF No. 139 at 6–7.)

Mary began receiving treatment from Parasmo in 2003, and at that time she was suffering from fibromyalgia and spinal problems.  (GX 15.)  She also, like other patients of Parasmo, had longstanding and active substance abuse issues while she was under Parasmo's care.  (Tr. 565; GX 15.)  Dr. Waldman testified that while under Parasmo's care, Mary "had frequent episodes of aberrant behavior, she had evidence of doctor shopping, evidence that prescriptions were written even when the patient had abnormal toxicology screens documenting that she had presence of other substances."  (Tr. 565; GX 15.)  Records from 2009 indicated that Mary had recently relapsed

23

from heroin and cocaine use, which Dr. Waldman testified showed "an uncontrolled substance abuse problem." (Tr. 568; GX 15.)  Nevertheless, Parasmo prescribed her "very, very large doses" of oxycodone, fentanyl, Xanax, and methadone.  (Tr. 570–71; GX 15.)  Dr. Waldman singled out the "astronomically high" dose of methadone, which, when combined with her other prescribed medications, put Mary at "an extremely high risk for overdose."  (Tr. 571.)  In March 2015, Parasmo noted that Mary "talks in half sentences," and that he had "no idea what she was talking about."  (GX 15.)  Dr. Waldman testified that "confusion just like this" is an expected side effect given the doses of narcotics that Parasmo had prescribed.  (Tr. 573.)

Dr. Waldman explained that, by the time Parasmo wrote the prescriptions underlying Counts 28, (GX 54), 29, (GX 55), and 30, (GX 56), "there were numerous pieces of evidence here that made it very clear that this patient has a substance abuse disorder and was not being treated and it was not in her best interest to receive oxycodone rather than treatment for substance abuse disorder." (Tr. 566–67.)  Accordingly, he testified that they had not been issued in the usual course of professional medical practice for a legitimate medical purpose.  (Tr. 565–66.)

### 17.   Andrew Roland (Count 31)

Parasmo was convicted of unlawfully prescribing 180 30-mg oxycodone pills to Andrew Roland ("Andrew") on June 12, 2015.  (ECF No. 139 at 7.)

Andrew was 20 years old when he began seeing Parasmo in 2005.  (Tr. 596; GX 16.)  He developed back pain the following year.  Parasmo prescribed hydrocodone and referred him to physical therapy and to obtain steroid injections.  (Tr. 597; GX 16.)  Andrew underwent an MRI in March 2012.  Dr. Waldman characterized the results as "very common," showing "minimal changes" in Andrew's back condition, which may or may not have caused him pain.  (Tr. 601; GX 16.)  Parasmo prescribed oxycodone to Andrew for the first time.  (Tr. 598–98; GX 16.)

From November 2013 to January 2014, Parasmo increased Andrew's prescription for

oxycodone by 50% without explaining his basis for doing so.  (Tr. 602; GX 16.)  Abnormal toxicology screens followed.  In 2014, two toxicology screens returned positive for methadone, morphine, fentanyl, and amphetamines—none of which had been prescribed.  (Tr. 599; GX 16.) Later in 2014, Andrew asked Parasmo to take him off oxycodone.  (Tr. 603; GX 16.)  In December 2014, he tested positive for morphine and fentanyl, neither of which had been prescribed.  (Tr. 603; GX 16.)

In February 2015, Parasmo referred Andrew to a pain management specialist, Dr. Shalmi. (Tr. 274, 599; GX 16.)  Dr. Shalmi examined Andrew on February 27, 2015 and March 11, 2015. (Tr. 274–75; GX 16.)  Andrew complained of chronic pain in his lower back and lower extremities, and he stated that he wanted to come off the pain medication that Parasmo had prescribed to him. (Tr. 275.)  An MRI showed "only modest findings and degenerative changes, which is common," according to Dr. Waldman.  (Tr. 599–600; GX 16.)  At these appointments, Dr. Shalmi advised Andrew that he could participate in a Suboxone treatment program or wean off the oxycodone prescribed by Parasmo.  (Tr. 275–79.)  Andrew did not return to Dr. Shalmi after his March 11 appointment.  (Tr. 282–83.)

On June 12, 2015, Parasmo issued the oxycodone prescription underlying Count 31.  (GX 57.)  Dr. Waldman testified that "to continue to give [Andrew] the same prescriptions perpetuates the tolerance and the dependence on oxycodone," and that "he should have been referred for addiction treatment and weaned off opioids, rather than continue to get prescriptions of opioids." (Tr. 605–06.)  Dr. Waldman testified that, considering Andrew's abnormal toxicology reports and the recommendations of Dr. Shalmi, the June 12, 2015 prescription was written outside the usual course of professional medical practice and without a legitimate medical purpose.  (Tr. 597, 605–06.)

### 18.    Robert Wilson (Count 34)

Parasmo was convicted of unlawfully prescribing 180 30-mg oxycodone pills to Robert Wilson on December 12, 2014.  (ECF No. 139 at 8.)

Wilson first saw Parasmo in 2003; he was 42 years old at the time.  (Tr. 757; GX 19.)  He complained of severe swelling in his right knee, "unbearable pain," and piriformis muscle problems.  (Tr. 757; GX 19.)  By 2011, Wilson had spent a year in rehab for alcohol and painkiller abuse, which Dr. Waldman testified indicated "a predisposition to relapsing for substance abuse." (Tr. 760–61; GX 19.)   Subsequently, Wilson had multiple abnormal toxicology screens in December 2011, March 2012, September 2013, January 2014, and June 2014.   These reports reflected, at various points, the presence of drugs not prescribed—such as morphine, methadone, and heroin—as well as the absence of drugs that Parasmo had prescribed.  (Tr. 759–60; GX 19.) In addition, Wilson also informed Parasmo in 2013 that he had purchased 240 oxycodone pills on the street in Florida.  (Tr. 760, 765; GX 19.)  Dr. Waldman testified that Wilson's mixing of narcotics, as reflected in the toxicology reports, was "another marker for a substance abuse disorder."  (Tr. 766.)  Moreover, by prescribing oxycodone to Wilson, Parasmo increased what was already a "significant" overdose risk "even higher."  (Tr. 767.).  Dr. Waldman concluded, based on this evidence, that Parasmo's December 12, 2014 prescription, (GX 60), was not issued in the normal course of professional practice and was not for a legitimate medical purpose.  (Tr. 758.)

### 19.    Debra Wreckter (Count 35)

Parasmo was convicted of unlawfully prescribing 180 5-mg oxycodone pills to Debra Wreckter on February 27, 2015.  (ECF No. 139 at 8.)

Parasmo began treating Wreckter in 1999.  (GX 20.)  In 2006, she suffered a herniated disc following a bad fall.  (GX 20.)  Parasmo prescribed her Vicodin, and later increased her medication

to include a fentanyl patch, time-released morphine, Xanax, and hydrocodone.  (Tr. 552–553; GX 20.)  By 2011, Parasmo noted that Wreckter's cocaine addiction, which he had diagnosed in 2009, had caused her nasal septum and hard palate to disappear.  (Tr. 553–54, 557; GX 20.)  Dr. Waldman testified that this indicates "very heavy or long cocaine abuse," and that "if somebody has an active uncontrolled substance abuse disorder, they should not continue to get prescriptions of opioids except in very specific circumstances."  (Tr. 558.)  Parasmo nevertheless continued prescribing hydrocodone, and in December 2011, he began prescribing oxycodone to her instead. (Tr. 554; GX 20.)

Multiple toxicology screens reflected that Wreckter continued to use cocaine—as well as morphine, methadone, and other drugs not prescribed by Parasmo—into 2015, years after Parasmo diagnosed her addiction.  (Tr. 554–55; GX 20.)  In addition to these signs of her substance abuse, notes from December 2012 show that a pharmacy contacted Parasmo's office out of concern that he was overprescribing opioids to Wreckter.  (Tr. 554, 559–60; GX 20.)  There were also signs that Wreckter was diverting her oxycodone, including notes from May 2013 reflecting that Wreckter gave oxycodone to her husband.  (Tr. 560; GX 20.)  However, Parasmo continued to prescribe her oxycodone until March 2015.  (Tr. 560–63; GX 20.)  Dr. Waldman concluded that, particularly in light of Parasmo's awareness of Wreckter's substance abuse issues, the February 27, 2015 prescription, (GX 61), was not issued in the normal course of professional practice and was not for a legitimate medical purpose.  (Tr. 552.)

### 20. The DEA Investigation

The jury also heard from Dean Steinmann ("Detective Steinmann"), a retired detective who previously worked at the Port Washington Police Department and as a Task Force Officer with the United States Drug Enforcement Administration ("DEA").  (Tr. 104–06.)  Beginning in 2013, Detective Steinmann was assigned to the DEA's Long Island Tactical Diversion Squad, which

investigates physicians and pharmacists who dispense controlled substances.  (Tr. 106–07.)

On July 1, 2015, following Officer Argyros' tip regarding Maurice Milano, (see supra, n.3), Detective Steinmann interviewed Parasmo at his office in Deer Park, New York, along with DEA Special Agent Anton Kohut.  (Tr. 111–14.)  Detective Steinmann, Special Agent Kohut, and Parasmo discussed Parasmo's opioid prescribing practices.  (Tr. 123.)  Parasmo told them that he had received a letter from the New York State Medical Society, "a couple years back," informing him that the amount of oxycodone prescriptions he had issued placed him in the top 10% of physicians in New York.  (Tr. 123–24.)  Detective Steinmann testified that Parasmo said he "felt nervous about that letter," and that "he was getting a lot, more and more pain patients," but he and his staff "kept trying to weed out or get rid of" the pain patients.  (Tr. 124.)  Special Agent Kohut told Parasmo that, according to records from the New York Bureau of Narcotics Enforcement ("BNE"), in the previous five years Parasmo had prescribed more than 1.5 million opioid pills. (Tr. 129.)

Detective Steinmann also testified that Parasmo told them that the physician with whom he shared his office, Dr. Rachel Celebenski, did not prescribe pain medication, nor did several other physicians with whom Parasmo had spoken.  (Tr. 125.)  Detective Steinmann testified that Parasmo told them that "his staff approached him to inform him, 'Hey, we got to start cutting down on the pills[.]'"  (Tr. 129–30.)  Parasmo explained to Detective Steinmann and Special Agent Kohut that because he had received "a big influx" of pain patients seeking opioids, in March 2015, he had hung a sign in his office stating that "he wasn't going to be writing any more controlled substance or opioid prescriptions."  (Tr. 126.)  In practice, however, Parasmo continued writing oxycodone and/or hydrocodone prescriptions through at least December 2015.[4]

---

[4]     Parasmo wrote oxycodone or hydrocodone prescriptions for the following patients after March 2015:  Summer Ferro (Count 7), Brian Horace (Count 10), Leslie Finnegan-Andrews (Counts 11 and 12),

DEA Intelligence Research Specialist Adrian Castro ("Specialist Castro") also testified regarding Parasmo's opioid prescribing practices. (Tr. 1724–44.) Relying on BNE data, Specialist Castro testified that between 2010 and 2013, the number of oxycodone prescriptions written by Parasmo doubled, and the number of actual pills prescribed more than doubled. (Tr. 1740–41; GX 75–76.) Although Parasmo wrote fewer oxycodone prescriptions in 2014, the number of oxycodone pills prescribed continued to increase year-over-year. (Tr. 1741; GX 75–76.) Specialist Castro testified that this trend changed in July 2015—the month Detective Steinmann and Special Agent Kohut interviewed Parasmo—when both the number of oxycodone prescriptions and actual pills prescribed began decreasing. (Tr. 1742–43; GX 77, 98.)

## C.   **Procedural History**

Trial commenced on September 14, 2021. (ECF No. 115.) On October 7, 2021, the jury convicted Parasmo on Counts 1–5, 7–31, and 34–35. (ECF No. 139.) The jury acquitted him on Counts 6, 32, and 33. (Id.)

Parasmo timely filed a motion for acquittal under Rule 29, (ECF No. 144), which the Government opposed (ECF No. 147). Following the United States Supreme Court's decision in Ruan v. United States, 142 S. Ct. 2370 (2022), Parasmo filed a supplemental motion for acquittal, or in the alternative, for a new trial, pursuant to Rule 33. (ECF No. 151.) The Government opposed Parasmo's supplemental motion (ECF No. 154), and Parasmo filed a reply in further support of his supplemental motion (ECF No. 155).

## II.   MOTION FOR A NEW TRIAL

The Court begins its analysis with Parasmo's motion for a new trial pursuant to Federal Rule of Criminal Procedure 33. Parasmo challenges the Court's jury instructions in the wake of

---

Maurice Milano (Count 15), Leonard Marino (Counts 16 and 17), Rocco Oliveri (Counts 19 and 20), Paul Peskett (Count 21), Maria Scalcione (Count 23), Michael Morrow (Count 25), Steven Morrow (Count 27), Mary Fusco Roland (Count 30), and Andrew Roland (Count 31).

<u>Ruan</u> and contends that the Court should grant a new trial due to instructional error.[5]   (Def.'s Rule

33 Mem. at 9, ECF No. 151-1; Def.'s Rule 33 Reply, ECF No. 155.)   The Government opposes

Parasmo's motion.   (Gov't Rule 33 Opp'n, ECF No. 154.)

## A.   <u>Legal Standard</u>

Under Rule 33, "[u]pon the defendant's motion, the court may vacate any judgment and

grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  However, a district

court must exercise this discretion "sparingly and in the most extraordinary circumstances, . . . and

only in order to avert a perceived miscarriage of justice."  <u>United States v. Gramins</u>, 939 F.3d 429,

444 (2d Cir. 2019) (quotation marks and citations omitted).  The "ultimate test" for granting a new

trial pursuant to Rule 33 is "whether letting a guilty verdict stand would be a <u>manifest</u>

<u>injustice</u>."  <u>Id.</u> (quotation marks and citation omitted).

## B.   <u>The Jury Instructions</u>

On September 7, 2021, Parasmo and the Government submitted their proposed jury

instructions to the Court.  (ECF No. 106-1.)  They disagreed regarding elements of the § 841

charge.  Parasmo requested that, in line with authority from the First Circuit,[6] the Court instruct

the jury that in order to find him guilty under § 841, "the government must prove beyond a

reasonable doubt that Dr. Parasmo believed he was acting illegally under a criminal drug law by

---

[5]   Rule 33 provides that "[a]ny motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 14 days after the verdict or finding of guilty."  Fed. R. Crim. P. 33(b)(2).  However, the Court may extend the 14-day deadline for filing post-trial motions, even after the deadline has expired, upon a finding of "excusable neglect."  Fed. R. Crim. P. 45(b)(1)(B).  Although Parasmo filed his Rule 33 motion approximately nine months after he was convicted at trial, the Court will consider the motion because it was filed shortly after the Supreme Court's decision in <u>Ruan</u>.  <u>See</u> <u>United States v. Mangano</u>, No. 16-CR-540 (JMA), 2022 WL 65775, at *23 (E.D.N.Y. Jan. 6, 2022) ("A significant intervening change in law constitutes a valid basis to extend time under Rule 45(b)(1)(B).") (quoting <u>United States v. Kirsch</u>, 151 F. Supp. 3d 311, 315 (W.D.N.Y. 2015), <u>aff'd</u>, 903 F.3d 213 (2d Cir. 2018)).

[6]   Parasmo's proposed § 841 instruction was derived in relevant part from the jury instructions in <u>United States v. Zolot</u>, No. 11-CR-10070 (D. Mass.), ECF No. 636.  (<u>See</u> Scaring Aff., Ex. A at 4 n.4, 6 n.9, ECF No. 151-3.)

writing the prescription." (Scaring Aff., Ex. A at 5, ECF No. 151-3.)  He also asked the Court to instruct the jury that "[a] doctor distributes a drug in good faith when he believes he is medically treating a patient for a legitimate medical purpose and in the usual course of medical practice. Good faith in this context means good intentions and the honest exercise of professional judgment as to the patient's needs." (Id. at 7.)

In contrast to Parasmo's proposed instructions, the Government requested that the Court instruct the jury that the Government must prove beyond a reasonable doubt that Parasmo "knowingly and intentionally prescribed the controlled substances outside the bounds of professional medical practice and not for a legitimate medical purpose."[7]  (ECF No. 106-1 at 34.) With respect to Parasmo's good faith, the Government asked the Court to instruct the jury that "[g]ood faith in this context means acting reasonably and with the honest exercise of best professional judgment as to a patient's needs; that is, that the defendant acted in accordance with what he reasonably believed to be the standard of medical practice generally recognized and accepted in the State of New York."  (Id. at 37.)

Ultimately, the Court instructed the jury that in order to prove that Parasmo violated § 841, the Government must establish beyond a reasonable doubt the following elements: "First, that the defendant knowingly and intentionally distributed the controlled substance alleged in the indictment.  And, second, that the defendant knowingly and intentionally prescribed the controlled substances outside the bounds of professional medical practice and not for a legitimate medical purpose."  (Tr. 2247.)  With respect to the second element, the Court instructed the jury as follows:

> As to the second essential element, implicit in the registration of a physician with the Drug Enforcement Administration, to be allowed to prescribe controlled substances, is the understanding that he is authorized only to act as a physician, and when he knowingly and intentionally acts outside the bounds of professional

---

[7]     The Government's proposed § 841 instruction was adapted from the jury charge given by the Honorable Joseph F. Bianco in United States v. Belfiore, No. 15-CR-242 (E.D.N.Y.), ECF No. 180.  (See ECF No. 106-1 at 2 n.1.)

medical practice, and without a legitimate medical purpose in prescribing controlled substances, he is doing so in an unlawful manner.

(Tr. 2248–49.) The Court instructed the jury that a person acts "knowingly" if "he acts purposely and voluntarily and not because of a mistake, accident or other innocent reason." (Tr. 2249.) The Court explained that a person acts "intentionally" if "he acts willfully and with specific intent to do whatever it is the law forbids." (Tr. 2249.) The Court continued by providing the following instructions, again regarding the second element:

> Because many controlled substances have an accepted medical use, federal law authorizes registered practitioners, including doctors and pharmacies, to distribute controlled substances pursuant to lawful prescriptions. The defendant is a registered practitioner. To be lawful, a prescription must meet certain requirements. Section 1306.04(A) of Title 21 of the Code of Federal Regulations provides in relevant part:
>
>> A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner.
>>
>> An order purporting to be a prescription issued not in the usual course of professional treatment is not a prescription within the meaning and intent of [Section 841], and, the person issuing it shall be subject to penalties provided for violations of these provisions of the law relating to controlled substances.
>
> The terms usual course of his professional practice, and usual course of professional treatment, refer to generally accepted medical practice. If you find that the defendant prescribed the Schedule II controlled substance, then you should consider whether the government has proven beyond a reasonable doubt that the defendant did so knowingly and intentionally, outside of the usual course of his professional practice and for no legitimate medical purpose.
>
> In making a medical judgment concerning the right treatment for an individual patient, physicians have discretion to choose among a wide range of available options. Therefore, in determining whether the defendant acted without a legitimate medical purpose, you should examine all of the defendant's actions and the circumstances surrounding them. In determining whether or not the defendant's actions conformed with generally accepted medical practice, you should determine whether the defendant's action conformed with what is objectively considered generally accepted medical practice.
>
> A practitioner is not permitted to substitute his or her view of what is good medical practice for standards generally recognized and accepted in the State of New York.

32

The usual course of professional medical practice refers to the standard of medical practice and treatment generally recognized and accepted in the State of New York.

However, you must remember this is not a medical malpractice case. It is not enough for the government to prove negligence, malpractice, carelessness or sloppiness on Dr. Parasmo's part. You cannot convict the defendant if all the government proves is that he is an inferior doctor.

What the government must prove beyond a reasonable doubt is that when the doctor wrote the prescriptions that are the subject of the indictment he was not writing those prescriptions for a legitimate medical purpose, but was instead writing them outside the usual course of professional practice. In determining the usual course of professional medical practice, you should consider the totality of the defendant's actions and circumstances surrounding them, including evidence of accepted professional standards of care in effect at the time. You should also consider the extent if at all of any deviation from and of the severity of any such deviation from professional standards.

(Tr. 2250–53.) Finally, the Court provided the following instruction regarding the effect of Parasmo's good faith:

> In connection with this element, you must also determine whether the defendant acted in good faith. A doctor prescribes a drug in good faith in medically treating a patient when he prescribes the drug for a legitimate medical purpose in the usual course of practice; that is, the doctor has prescribed the drug lawfully. Good faith in this context means acting reasonably and with the honest exercise of best professional judgment as to a patient's needs; that is, the defendant acted in accordance with what he reasonably believed to be the standard of medical practice generally recognized and accepted in the State of New York.
>
> If you find that the defendant acted in good faith in prescribing the drugs, then you must find him not guilty. The government bears the burden of proving beyond a reasonable doubt that the defendant acted without a good faith belief that his distribution of the controlled substances, oxycodone and hydrocodone, was for a legitimate medical purpose in the usual course of medical practice.

(Tr. 2253–54.)

## C.    The Supreme Court's Decision in *Ruan*

The statute underlying Parasmo's convictions, 21 U.S.C. § 841(a), provides that it is unlawful for any person, "except as authorized," to "knowingly or intentionally" "manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." Under applicable regulations, a prescription for a controlled substance is only authorized, and thus does not violate § 841, when a doctor issues it "for a legitimate medical

33

purpose . . . acting in the usual course of his professional practice." 21 C.F.R. § 1306.04(a).

In June 2022, the Supreme Court held in Ruan, for the first time, "that § 841's 'knowingly or intentionally' mens rea applies to the 'except as authorized' clause," in addition to the statute's actus reus ("manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance"). 142 S. Ct. at 2376. Therefore, "once a defendant meets the burden of producing evidence that his or her conduct was 'authorized,' the Government must prove beyond a reasonable doubt that the defendant knowingly or intentionally acted in an unauthorized manner." Id. at 2376. The Court explained that "[a] strong scienter requirement helps to diminish the risk of 'overdeterrence,' i.e., punishing acceptable and beneficial conduct that lies close to, but on the permissible side of, the criminal line." Id. at 2378 (citation omitted). However, the Court emphasized, citing 21 C.F.R. § 1306.04(a), that "[t]he Government, of course, can prove knowledge of a lack of authorization through circumstantial evidence. . . . As we have said before, 'the more unreasonable' a defendant's 'asserted beliefs or misunderstandings are,' especially as measured against objective criteria, 'the more likely the jury . . . will find that the Government has carried its burden of proving knowledge.'" Id. at 2382 (quoting Cheek v. United States, 498 U.S. 192, 203–04 (1991)).

**D.      Analysis of the Jury Instructions Under *Ruan***

Parasmo asserts that the Court's jury instructions regarding § 841 were erroneous under Ruan. Specifically, he contends that the Court erred by instructing the jury that his "conduct in dispensing controlled substances was criminal to the extent that it did not comport with 'generally accepted medical practice,'" and by "emphasiz[ing] that any belief on the part of the Defendant needed to be 'reasonable.'" (Def.'s Rule 33 Mem. at 11–12.) He argues that the jury should have been charged that "the government must prove beyond a reasonable doubt that [he] believed he was acting illegally under a criminal drug law by writing the prescription." (Id. at 12.) The

Government, on the other hand, argues that the jury instructions were not erroneous, even under Ruan.  (Gov't Rule 33 Opp'n at 4–5.)

"A jury charge is erroneous if it 'either fails to adequately inform the jury of the law, or misleads the jury as to a correct legal standard.'"  United States v. Mangano, No. 16-CR-540 (JMA), 2022 WL 65775, at *32 (E.D.N.Y. Jan. 6, 2022) (quoting United States v. Silver, 948 F.3d 538, 547 (2d Cir. 2020)).  As explained below, the Court finds no error in the jury charge.

First, the Court's instructions clearly stated that the Government must prove beyond a reasonable doubt that Parasmo (1) "knowingly and intentionally distributed the controlled substance alleged in the indictment," and, as required under Ruan, that Parasmo (2) "knowingly and intentionally prescribed the controlled substances outside the bounds of professional medical practice and not for a legitimate medical purpose."  (Tr. 2247.)  The Court instructed the jury that this second element is "essential," as a doctor prescribing a controlled substance acts unlawfully under § 841 only "when he knowingly and intentionally acts outside the bounds of professional medical practice, and without a legitimate medical purpose in prescribing controlled substances[.]"  (Tr. 2248–49.)  This is precisely what Ruan commands—i.e., that "the Government must prove beyond a reasonable doubt that the defendant knowingly or intentionally acted in an unauthorized manner."  142 S. Ct. at 2376.

Second, the Court's instructions emphasized that "this is not a medical malpractice case."  (Tr. 2252.)  The Court explained that, as such, "[i]t is not enough for the government to prove negligence, malpractice, carelessness or sloppiness on Dr. Parasmo's part.  You cannot convict the defendant if all the government proves is that he is an inferior doctor."  (Tr. 2252.)  Thus, the Court's instruction was designed to avoid the risk of "overdeterrence" and "reduc[ing] culpability on the all-important element of the crime to negligence."  Ruan, 142 S. Ct. at 2378, 2381.

Third, the Court instructed the jury that, in evaluating whether Parasmo had knowingly or

intentionally acted without "a legitimate medical purpose, . . . outside the usual course of professional practice," i.e., without authorization, the jury was entitled to consider "the totality of the defendant's actions and circumstances surrounding them, including evidence of accepted professional standards of care in effect at the time," as well as "the extent if at all of any deviation from and of the severity of any such deviation from professional standards."  (Tr. 2252–53.) Although Parasmo argues that this was error, (Def.'s Rule 33 Mem. at 11–12), the Supreme Court held in Ruan that "[t]he Government, of course, can prove knowledge of a lack of authorization through circumstantial evidence. . . .  [a]nd the regulation defining the scope of a doctor's prescribing authority does so by reference to objective criteria such as 'legitimate medical purpose' and 'usual course' of 'professional practice.'"  142 S. Ct. at 2382 (citing 21 C.F.R. § 1306.04(a)); see also id. (citing Gonzales v. Oregon, 546 U.S. 243, 285 (2006) (Scalia, J., dissenting) ("The use of the word 'legitimate' connotes an objective standard of 'medicine'") and United States v. Moore, 423 U.S. 122, 141–42 (describing Congress' intent "to confine authorized medical practice within accepted limits" (emphasis added))).  Accordingly, the Court finds no error here.

Fourth, and finally, Parasmo contends that the Court erred by instructing the jury that a doctor prescribes a controlled substance "lawfully" when the doctor does so "in good faith," which "means acting reasonably and with the honest exercise of best professional judgment as to a patient's needs; that is, the defendant acted in accordance with what he reasonably believed to be the standard of medical practice generally recognized and accepted in the State of New York." (Def.'s Rule 33 Mem. at 12 (citing Tr. 2253).)  Specifically, Parasmo objects to the Court's reference to his "reasonabl[e]" belief, to the extent that this implied that the jury could convict him for violating § 841 based on an objective, rather than subjective, standard.  (Id.)

Parasmo is correct that § 841 "nowhere uses words such as 'good faith,' 'objectively,' 'reasonable,' or 'honest effort.'"  Ruan, 142 S. Ct. at 2381.  He is likewise correct that following

Ruan, for purposes of a criminal conviction under § 841, the Government must prove that a defendant "knew or intended that his or her conduct was unauthorized." Id. at 2382. However, Parasmo appears to ignore the Supreme Court's additional guidance that, "[a]s we have said before, 'the more unreasonable' a defendant's 'asserted beliefs or misunderstandings are,' especially as measured against objective criteria, 'the more likely the jury . . . will find that the Government has carried its burden of proving knowledge.'" Id. at 2382 (quoting Cheek, 498 U.S. at 203–04); see also United States v. Sabean, 885 F.3d 27, 45 (1st Cir. 2018) (explaining in appeal of § 841 conviction that "the further that a defendant strays from accepted legal duties, the more likely that a factfinder will find him to be in knowing disregard of those duties"). Here, as the Government notes, (Gov't Rule 33 Opp'n at 4), the Court's instructions emphasized that the jury must evaluate "what he reasonably believed[.]" (Tr. 2253 (emphasis added).) The instructions also stressed that the Government had to prove that the defendant acted without a "good faith belief," which necessarily required the jury to evaluate Parasmo's subjective "belief." (Tr. 2253–54 (emphasis added).)

The jury charge thus focused on whether Parasmo himself believed that he was acting in good faith, while also recognizing that, in line with Ruan, that the jury may consider the reasonableness of a defendant's "asserted beliefs or misunderstandings . . . as measured against objective criteria." 142 S. Ct. at 2382. The Government still bore the burden to prove that Parasmo had knowingly or intentionally acted outside the bounds of professional medical practice and not for a legitimate medical purpose. And the jury was explicitly informed of this critical requirement. (Tr. 2247 (stating that the government must prove that "the defendant knowingly and intentionally prescribed the controlled substances outside the bounds of professional medical practice and not for a legitimate medical purpose").

The Court's conclusion is bolstered by the Eleventh Circuit's recent decision, applying the

Supreme Court's decision in <u>Ruan</u>, that the jury instructions at issue in that case were erroneous.

56 F.4th 1291 (11th Cir. 2023) ("<u>Ruan II</u>").  In <u>Ruan</u>, the district court instructed the jury that

> For a controlled substance to be lawfully dispensed by a prescription, the prescription must have been issued by a practitioner both within the usual course of professional practice and for a legitimate medical purpose.  If the prescription was issued either, one, not for a legitimate medical purpose or, two, outside the usual course of professional practice, then the prescription was not lawfully issued.

> A controlled substance is prescribed by a physician in the usual course of professional practice and, therefore, lawfully if the substance is prescribed by him in good faith as part of his medical treatment of a patient in accordance with the standard of medical practice generally recognized and accepted in the United States.  The appellants in this case maintain at all times they acted in good faith and in accordance with standard of medical practice generally recognized and accepted in the United States in treating patients.

> Thus a medical doctor has violated section 841 when the government has proved beyond a reasonable doubt that the doctor's actions were either not for a legitimate medical purpose or were outside the usual course of professional medical practice.

<u>United States v. Ruan</u>, 966 F.3d 1101, 1166 (11th Cir. 2020).

In holding that this instruction "inadequately conveyed the required mens rea," the Eleventh Circuit explained that "it is the defendant's subjective intent that matters," and this instruction "did not help convey that a subjective analysis was required for the 'except as authorized' exception."  <u>Ruan II</u>, 56 F.4th at 1297.  The instruction was also inadequate because it "essentially repeated the language from 21 C.F.R. § 1306.04(a) without linking it to any requirement that the jury find a lack of good faith or scienter for this exception."  <u>Id.</u> at 1298.  By contrast, in this case, as discussed above, the Court instructed the jury that to convict Parasmo for violating § 841, the Government must prove that he "knowingly and intentionally prescribed the controlled substances outside the bounds of professional medical practice and not for a legitimate medical purpose."  (Tr. 2247.)  This instruction—unlike the instruction in <u>Ruan</u>—clearly conveyed "that a subjective analysis was required for the 'except as authorized' exception."  <u>Ruan II</u>, 56 F.4th at 1297.

Ruan is also notable for another reason.  In <u>Ruan</u>, the Eleventh Circuit found that the

instruction for the substantive § 841(a) charges—which lacked critical language that was included in Parasmo's instructions—was erroneous.  Despite finding error in the instruction for the substantive charges, the Eleventh Circuit, however, still upheld the defendants' convictions for conspiring to violate § 841(a) because the conspiracy instructions required the jury to find that the defendants knew the illegal object of the conspiracy.  Ruan II, 56 F.4th at 1299.  The Eleventh Circuit reasoned that "[f]or a defendant to know that the aim of their agreement was illegal in this context means that they would need to know both that (1) they were dispensing a controlled substance and (2) that they were doing so in an unauthorized manner."  Id.  Similarly, at Parasmo's trial, the jury was explicitly instructed that the Government had to prove that the "the defendant knowingly and intentionally prescribed the controlled substances outside the bounds of professional medical practice and not for a legitimate medical purpose."  (Tr. 2247.)  Given this instruction, the jury at Parasmo's trial was informed that the defendant had to know that he was dispensing a controlled substance in an unauthorized manner.

Accordingly, viewing the jury instructions regarding § 841 as a whole, the Court finds no error under Ruan.

**E.     Even if the Instructions Were Erroneous Under *Ruan*, Any Error Was Harmless**

Parasmo contends that he suffered prejudice as a result of the Court's purported instructional error.  He argues that the Court's instructions regarding § 841 "eviscerated [his] one and only defense," namely, that he "never intended to violate the law, but was responding—even if ineptly—to patients who presented as suffering from real and significant medical issues resulting in chronic pain."  (Def.'s Rule 33 Mem. at 13.)  The Government contends that, to the extent that the jury instructions were erroneous under Ruan, any error was harmless because the evidence at trial "showed beyond a reasonable doubt, that [Parasmo] would have been convicted under the Ruan standard."  (Gov't Rule 33 Opp'n at 5.)

"'Where a defendant has preserved his claim of error by a timely objection calling the district court's attention to the problem when the court would have the opportunity to fix the error, [the Second Circuit will] review a district court's jury charge de novo, and will vacate a conviction for an erroneous charge unless the error was harmless.'" Mangano, 2022 WL 65775, at *32 (quoting United States v. Nouri, 711 F.3d 129, 138 (2d Cir. 2013)). "For erroneous instructions to be harmless, it must be 'clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.'" Id. (quoting Silver, 948 F.3d at 547); see also United States v. Martoma, 894 F.3d 64, 72 (2d Cir. 2017) ("[W]e will not overturn a conviction if we find that the jury would have returned the same verdict beyond a reasonable doubt, and thus that the error did not affect the defendant's substantial rights.") (internal quotation marks and citation omitted). "The burden lies with the government to establish that [the] error is harmless." United States v. Skelos, 988 F.3d 645, 656 (2d Cir. 2021) (citing Silver, 948 F.3d at 569).

Based on the evidence presented at trial, the Court is convinced beyond a reasonable doubt that even if Parasmo had received the § 841 instruction that he requested, a rational jury would have found him guilty on Counts 1–5, 7–31, and 34–35. Indeed, there was overwhelming evidence at trial that Parasmo knowingly or intentionally prescribed oxycodone and/or hydrocodone outside the bounds of professional medical practice and without a legitimate medical purpose.

Parasmo continued to prescribe oxycodone and/or hydrocodone to his patients even when:

(i) the patient had suffered multiple drug overdoses, in the case of William Lott;

(ii) the patient had recently left a drug rehabilitation treatment program, in the case of Frankie Campanelli and Rocco Oliveri;

(iii) the patient had repeated abnormal toxicology screens reflecting the use of illicit drugs, in the case of Lott, Campanelli, Oliveri, Summer Ferro, Paul Peskett, Debra Wreckter, Mary Fusco Roland, Maurice Milano, Leonard Marino, Michael Morrow, Steven Morrow, John Lettenberger, Maria Scalcione, Robert Wilson, and Christina Pepe;

(iv) the patient had repeated abnormal toxicology screens reflecting the absence of prescribed opioids, suggesting that their pills were being diverted for non-medical

purposes, in the case of Milano, Marino, Oliveri, Scalcione, Wilson, Steven Morrow, Michael Morrow, and Leslie Finnegan-Andrews;

(v) the patient had a long and well-documented history of substance abuse issues, in the case of Lott, Milano, Wreckter, Lettenberger, Oliveri, Peskett, Scalcione, Wilson, Pepe, Mary Fusco Roland, Michael Morrow, Steven Morrow, and Brian Horace;

(vi) Parasmo himself had recognized that he should cease prescribing opioids to the patient, in the case of Ferro, Milano, Oliveri, Scalcione, Horace, Pepe, Marino, and Steven Morrow; and

(vii) third parties—including other physicians, pharmacists, and law enforcement officers—objected to Parasmo's decision to prescribe opioids to patients, in the case of Lettenberger, Milano, Oliveri, Scalcione, Wreckter, Steven Morrow, and Andrew Roland.

(See Gov't Rule 33 Opp'n at 7.)   Additionally, Dr. Waldman testified that none of these prescriptions was issued in the usual course of professional medical practice and for a legitimate medical purpose.  See supra, Section I.B.

Parasmo contends that the evidence at trial "bore no resemblance to the prototypical pill mill case; there were no runners, no 'fake' patients, and no cash payments."  (Def.'s Rule 33 Mem. at 13.)  However, the evidence at trial showed that, on multiple occasions with different patients, Parasmo was aware that the oxycodone and/or hydrocodone he prescribed was not being used for a legitimate medical purpose and was instead being diverted for secondary dealing.   When confronted with this evidence, however, Parasmo continued to prescribe opioids to these patients. For example, Rocco Oliveri repeatedly informed Parasmo that his medication had been stolen from him in his home, including at least once by his son's friends.   Oliveri's medical records also evidence possible drug dealing activity taking place in his home.   Contemporaneous toxicology reports confirmed that Oliveri was not taking the opioids that Parasmo had prescribed to him. Despite this evidence that Oliveri's oxycodone was being diverted, Parasmo continued issuing prescriptions to him.  Dr. Waldman characterized this as "a terrible mistake," (Tr. 703), as "to continue to give the patient prescriptions for oxycodone to allow that to go on is just perpetuating the diver[t]ing of the medication and has nothing to do with the patient's pain condition or with

his health." (Tr. 705.) Like Oliveri, Maria Scalcione's toxicology screens repeatedly returned negative for prescribed opioids. Even after her sister contacted Parasmo and told him that Scalcione was selling her pills, however, he continued prescribing oxycodone. And as another example, Parasmo's records show that he knew that Paul Peskett was sharing his opioid prescriptions with his wife. Dr. Waldman testified that it would be "very dangerous, obviously" for Parasmo to prescribe an opioid for an individual who was not his patient, and that he "never heard of a situation where somebody would write a prescription to somebody else unless they're intending for it to be diverted." (Tr. 722.) There was even evidence that Parasmo was aware that Leslie Finnegan-Andrews and John Lettenberger were selling their oxycodone pills, and that Parasmo still did not stop issuing prescriptions to them. This was damning evidence that Parasmo knew that he was prescribing opioids outside of the bounds of professional medical practice and without a legitimate medical purpose.

Parasmo also argues that the evidence shows that he "repeatedly made efforts to wean various patients off their medications or to refer them out to pain specialists—hardly the actions of a doctor who subjectively intends to act as a 'drug pusher.'" (Def.'s Rule 33 Mem. at 13.) However, as the Government points out, "even when [Parasmo] made entries in patient records stating 'no more pain meds' or 'no more controlled substances'—[he] kept on prescribing addictive controlled substances." (Gov't Rule 33 Opp'n at 7.) If anything, these records reflect Parasmo's knowledge that his continued prescriptions to these patients were not "authorized" within the meaning of § 841 because, as Dr. Waldman testified, they were issued outside the usual course of professional medical practice did not serve a legitimate medical purpose. Indeed, by 2015 Parasmo had been on notice for at least "a couple years," (Tr. 123), based on a letter he received from the New York State Medical Society, that the amount of oxycodone prescriptions he was issuing placed him in the top 10% of physicians in the entire state. Similarly, Detective

Steinmann testified that Parasmo told him and Special Agent Kohut that he had decided in March 2015—after his staff urged him to "start cutting down on the pills," (Tr. 129)—to cease prescribing pain medication to his patients.  However, BNE records reflect that he continued to prescribe oxycodone to his patients beyond March 2015.  (See supra, n.4.)  It was only after Detective Steinmann and Special Agent Kohut interviewed Parasmo on July 1, 2015 that his prescribing activity rapidly declined.  The jury was entitled to consider this evidence as probative of Parasmo's knowledge that these opioid prescriptions were not "authorized" within the meaning of § 841.

The evidence adduced at trial is precisely the type of "circumstantial evidence," measured against "objective criteria," which Ruan permits the Government to rely on in proving knowledge of a lack of authorization under § 841.  See 142 S. Ct. at 2382.

Parasmo argues, citing United States v. Pabisz, 936 F.2d 80 (2d Cir. 1991), that the purported charging error was not harmless.  (Def.'s Rule 33 Reply at 6–7, ECF No. 155.)  In Pabisz, the defendant was convicted at trial of federal income tax evasion.  936 F.2d at 82.  On appeal, he argued that the district court erred in instructing the jury that they could not credit his good faith defense unless they found that his beliefs were reasonable.  Id. at 83.  The Second Circuit determined that the instructions were erroneous because they did not, as required by an intervening Supreme Court decision, inform the jury "that [the] defendant's beliefs need not be objectively reasonable if they were actually held in good faith."  Id.  The court granted the defendant's request for a new trial and explained that because "the jury was erroneously instructed about the principal issue at trial, we are compelled to find that the fundamental fairness of the trial . . . was undermined."  Id. (internal citations and quotation marks omitted).

Relying on Pabisz, Parasmo contends that the purported instructional error here was not harmless because it "does not go to some corollary issue, but to the issue which was at the very heart of this case:  whether Dr. Parasmo was acting with subjective good faith."  (Def.'s Rule 33

Reply at 6–7.)  Parasmo also argues that "as in Pabisz, the Government continuously harped upon the objective standard and the unreasonableness of [his] conduct throughout its summation."  (Id. at 8; see also id. at 6; Def.'s Rule 33 Mem. at 14.)  Thus, he claims that, as in Pabisz, "the fundamental fairness of the trial . . . was undermined" by the purported instructional error.  (Def.'s Rule 33 Reply at 8 (quoting Pabisz, 936 F.2d at 83).)  The Court is unconvinced, as Pabisz is distinguishable.

First, it is not clear in Pabisz that the Government even argued that the instructional error was harmless in light of the strength of the evidence at trial.  See Pabisz, 936 F.2d at 83 (identifying the three arguments advanced by the Government).  Second, in Pabisz, the defendant—unlike Parasmo—took the stand.  The defendant testified regarding his subjective good faith belief that he was not required to pay taxes.  936 F.2d at 81–82.  He explained during his testimony that, "after reading a flier that analyzed a 1916 Supreme Court case, Brushaber v. Union Pacific Railroad Co., 240 U.S. 1, 36 S.Ct. 236, 60 L.Ed. 493 (1916), he went to a law library and read several Supreme Court cases concerning the obligation to pay taxes.  In addition, he studied the Internal Revenue Code, wrote letters to three Congressmen and contacted the IRS."  Id.  He also testified that, "based upon his research, he concluded that he was not required to file individual income tax returns or pay taxes.  Therefore, after 1981, he did not file any income tax returns and also claimed to be exempt from withholding in his W–4 forms."  Id.  Thus, in Pabisz, there was direct evidence of the defendant's subjective beliefs presented to the jury.  Here, by contrast, Parasmo did not testify that he subjectively believed that the prescriptions at issue were "authorized" within the meaning of § 841.  And as discussed above, there was overwhelming evidence to the contrary at trial.

The Court also finds distinguishable Ruan II, which, after holding that the substantive § 841 instructions were erroneous, concluded that this error was not harmless beyond a reasonable

doubt.  Ruan II, 56 F.4th at 1298.  At trial, both defendants, as well as the Government, presented expert evidence regarding the appropriate standard of care.  Id.  Crucially, both defendants testified that they believed that they had acted in accordance with the applicable standard of care.  Id.  The Eleventh Circuit concluded that "[t]he jury could have weighed all of this evidence and concluded that [the defendants] subjectively believed their conduct was in accord with the appropriate standard of care."  Id.  In other words, "a properly instructed jury may not have convicted the defendants had it known that [the defendants'] subjective beliefs that they were acting properly was a defense to these charges."  Id.  Under these circumstances, the Eleventh Circuit could not conclude that the erroneous instruction was harmless beyond a reasonable doubt.  Id.

The present case is strikingly different from Ruan II.  First, Parasmo did not present expert testimony regarding the standard of care.  The only expert testimony on this issue came from the Government's expert, Dr. Waldman, recounted above.  Second, and most importantly, Parasmo did not testify that he subjectively believed that he had acted in accordance with the standard of care.  In the absence of this evidence, there is no indication that here—in contrast to Ruan II, as well as Pabisz—a properly instructed jury may not have convicted Parasmo had it known that his subjective belief was a defense to charges under § 841.[8]

---

[8]    Parasmo also contends that this case is "closely analogous" to United States v. Tureso, 566 F.3d 77 (2d Cir. 2009), in which the Second Circuit reversed a defendant's conviction for aggravated identity theft based on the trial court's erroneous mens rea instruction.  (Def.'s Rule 33 Mem. at 14–15.)  There, the trial court had entirely omitted the required mens rea instruction, which had been announced in an intervening Supreme Court decision, that the Government must "show that the defendant knew that the means of identification at issue belonged to another person."  Tureso, 566 F.3d at 86 (emphasis added).  This instruction was erroneous because it "omit[ted] an essential element of the offense[.]"  Id.  And because evidence at trial did not "all flow in one direction," the Second Circuit could not conclude that the error was harmless beyond a reasonable doubt.  Id.  Parasmo argues that "[t]he same result is mandated here, where the Court's instructions failed to convey the correct scienter requirement—i.e., that a prescribing doctor must knowingly act in an unauthorized matter."  (Def.'s Rule 33 Mem. at 15.)  The Court disagrees.  Parasmo's premise is incorrect.  As discussed above, the Court correctly instructed the jury that Parasmo must knowingly or intentionally act in an unauthorized manner; it did not "omit[] an essential element of the offense."  Tureso, 566 F.3d at 86.  Therefore, the Court agrees with the Government, (Gov't Rule 33 Opp'n at 6), that Tureso is inapposite.  Additionally, even if the Court's instructions were erroneous, the evidence of Parasmo's guilt "flows in one direction," as discussed above.

45

Viewing the evidence at trial as a whole, the Court concludes that even if the § 841 jury instruction was erroneous, it is clear beyond a reasonable doubt that a rational jury would have found Parasmo guilty absent the error.  Accordingly, his Rule 33 motion is denied.

### III.   MOTION FOR ACQUITTAL

Parasmo also moves for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29.  He argues that while the evidence at trial "may have established that [he] failed to adhere to best medical practices," it is insufficient to establish that he was acting without a legitimate medical purpose, in violation of § 841.  (Def.'s Rule 29 Mem. at 1, ECF No. 144-1).  The Government opposes his motion.  (Gov't Rule 29 Opp'n, ECF No. 147.)

### A.   Legal Standard

Rule 29 provides that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a).  "The test for sufficiency . . . is whether a rational jury could conclude beyond a reasonable doubt that a defendant is guilty of the crime charged."  United States v. Napout, 332 F. Supp. 3d 533, 548 (E.D.N.Y. 2018), aff'd, 963 F.3d 163 (2d Cir. 2020) (quoting United States v. Eppolito, 543 F.3d 25, 45 (2d Cir. 2008)).  "The Court must make this determination with the evidence against a particular defendant . . . viewed in a light that is most favorable to the government . . . and with all reasonable inferences . . . resolved in favor of the government."  Id.  In doing so, the court must "defer[] to the jury's assessment of witness credibility and its assessment of the weight of the evidence."  United States v. White, 7 F.4th 90, 98 (2d Cir. 2021) (internal quotation marks and citations omitted).  "A judgment of acquittal is warranted only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt."  Martoma, 894 F.3d at 72 (internal quotation marks and citation omitted).  Accordingly, a defendant challenging a jury's guilty verdict

"'bears a heavy burden[.]'"  Mangano, 2022 WL 65775, at *58 (quoting United States v. Aguilar, 585 F.3d 652, 656 (2d Cir. 2009)).

**B.**   **Analysis**

The Court has already concluded with respect to Parasmo's motion for a new trial that the evidence is sufficient—even following Ruan—to support his § 841 convictions for knowingly or intentionally prescribing controlled substances without authorization.   Accordingly, Parasmo's sufficiency arguments under Rule 29, which requires the Court to view the evidence in the light most favorable to the Government, necessarily fail as well.   See Mangano, 2022 WL 65775, at *59.   Thus, his Rule 29 motion is denied.

## IV.   CONCLUSION

For the reasons stated above, Parasmo's motions for a judgment of acquittal, or in the alternative, for a new trial, are DENIED.

**SO ORDERED.**

Dated:  January 30, 2023
Central Islip, New York

_____/s/   (JMA)_____
JOAN M. AZRACK
UNITED STATES DISTRICT JUDGE